# UNITED STATES BANKRUPTCY COURT
## FOR THE
## DISTRICT OF MASSACHUSETTS

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

In re
**GARY W. FRAVEL,**                                      Chapter 7
    Debtor                                        Case No. 10-13943-JNF

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

**BREED'S HILL INSURANCE AGENCY, INC.,**
    Plaintiff
v.                                                   Adv. P. No. 10-1192
**GARY W. FRAVEL,**
    Defendant

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

## MEMORANDUM

## I. INTRODUCTION

The matter before the Court is the Motion of the Defendant, Gary W. Fravel (the

"Defendant" or the "Debtor"), for a Judgment on Partial Findings pursuant to which the

Defendant seeks judgment in his favor with respect to the Complaint filed against him by

Breed's Hill Insurance Agency, Inc. (the "Plaintiff" or "Breed's Hill").[1] On August 21, 2012,

the Court commenced a trial, and the Defendant made an oral motion for a directed verdict

---

[1] Breed's Hill did not set forth separate counts in its Complaint.  Rather it set forth
a Statement of Claims and a Demand for Relief.  In its Demand for Relief, it referenced 11
U.S.C. § 523(a)(2)(A), (a)(4) and (a)(6).

1

after the Plaintiff rested its case having called four witnesses and submitting 69 exhibits into evidence. At the Court's direction, the Defendant filed a separate motion pursuant to Fed. R. Civ. P. 52(c) made applicable to this proceeding by Fed. R. Bankr. P. 7052, and both parties filed briefs addressing the issue of whether judgment should enter with respect to the Complaint because the Plaintiff failed to introduce sufficient evidence to sustain its position.

## II. BACKGROUND

The Debtor filed a voluntary Chapter 7 petition on April 13, 2010.  On Schedule F-Creditors Holding Unsecured Nonpriority Claims, he listed Breed's Hill as the holder of a claim in the amount of $67,905.  On July 13, 2010, Breed's Hill timely filed a "Complaint Seeking Exclusion from Bankruptcy Protection" pursuant to which it alleged that Fravel a/k/a  Fravel & Associates Insurance a/k/a Fravel Insurance, as its agent, "fraudulently converted funds received as insurance premiums (the "Debt") to his own use and therefore, the Debt should be excluded from bankruptcy protection as it is neither a Debt owed nor nodischargeable [sic] under Bankruptcy Code 11 U.S.C. § 523(a)(2), (a)(4), and/or (a)(6) and an award of punitive damages, damages, costs and attorney's fees." Specifically, Breed's Hill alleged that the Debtor, in violation of Mass. Gen. Laws ch. 175, § 176, collected insurance premiums and appropriated them for his own use, rather than "hold[ing] those premiums in fiduciary trust and turn[ing] them over to Plaintiff . . . ."

## III. FACTS

The parties filed a Joint Pretrial Memorandum on June 27, 2011.  In their Joint

Pretrial Memorandum, the parties agreed to a number of pertinent facts.  Those agreed

facts are reproduced with minor modifications as follows:

1. Breed's  Hill is a Massachusetts corporation with a principal place of business located at Four 13th Street, Charlestown, Massachusetts.

2. Fravel is an individual residing at 358 Asbury Street, South Hamilton, Essex County, Massachusetts and doing business in Massachusetts under the name Fravel & Associates Insurance as well as Fravel Insurance at 183 Highland Street, South Hamilton, Essex County, Massachusetts.

3. Pursuant to insurance industry standards, as a retail broker, Fravel would charge a commission directly to his clients who bought Breed's Hill's insurance  policies, which commissions would compensate Fravel for his work ("Commissions").

4. Breed's Hill issued insurance policies and provided services through Fravel to Harbor View Condominium,  Robert and Irene Butler and Sandeep and Seema Arora ("Customers") from on or about June 24, 2005 to on or about May 29, 2007.

5. On or about  May 6, 2008, Breed's Hill filed a collection action complaint against Fravel alleging, among other things, breach of contract and violations of Mass. Gen. Laws ch. 93A also known as the unfair trade act seeking damages of over $60,000 from Fravel in the lawsuit entitled Breed's Hill Insurance Agency,  Inc. v. Gray W. Fravel d/b/a Fravel Insurance Agency, Docket Number 08-00920 with the Essex County Superior Court ("Collection Action").

6. On or about August 4, 2008, the Superior Court entered a default judgment in the Collection  Action in Breed's  Hill's favor.

7. On or about  August  4, 2008,  the Court, in Fravel's absence, specifically declined to make a ruling on the Breed's Hill's claims for unjust enrichment or Chapter 93A.

8. The default judgment was in the amount of $67,568, plus interest in the amount of $1,999.29 with respect to Counts I, II and III and contained an award of attorneys' fees in the amount of $17,229, as well as an additional

$337 in costs, for a total judgment of $87,133.39.

9. On or about October 20, 2008, Breed's Hill sought a trustee execution and obtained the same but no funds were available in the account attached.

10. On or about February 5, 2009, Breed's Hill sought and obtained an execution against Fravel, totaling $93,342.95, including interest.

11. In early April of 2010 Breed's Hill sought to serve the execution on Fravel.

12. On or about April 13, 2010, Fravel filed a Chapter 7 bankruptcy petition naming Breed's Hill as a creditor holding an unsecured nonpriority claim in the amount of $67,905.

***

14. Fravel failed to turn over to Breed's Hill monies which were the subject matter of the Collection Action.

Breed's Hill called a number of witnesses in support of its Complaint.  The first witness, Cynthia Butler Croteau ("Croteau"), the daughter of Robert and Irene Butler, testified as the co-owner and/or manager of three properties, namely two apartment buildings and a three-family house, located in Lynn, Massachusetts.  Her parents were involved with the properties at one time but are now elderly and in declining health. According to Croteau, in 2003 or 2004, she and family members, including her parents, moved their insurance business from the Cassidy Insurance Agency to an agency formed by Russ Fravel, the Debtor's father.   In 2007, after receiving communication from Clarendon National Insurance Company ("Clarendon") that premiums had not been paid and that policies were going to be canceled for nonpayment, Croteau became aware that

Fravel, not his father, was handling the insurance needs for the family properties from an office in Danvers, Massachusetts.  According to Croteau, Fravel informed her that he had obtained policies for her family from the Andover Company, although he had not advised her or other family members of the switch before that time.  Concerned about the situation, Croteau contacted Russ Fravel about the status of the policies, which were financed with Prime Rate Finance Company ("Prime Rate").  Fravel obtained insurance policies through Breed's Hill  with the proceeds of the insurance premium financing.  He subsequently channeled payments made by the Butlers through Fravel Insurance Agency to Prime Rate.  Croteau, however, learned that some checks made payable Fravel Insurance Agency were deposited in Fravel's personal bank account.

A letter from Croteau to Ellen Mahoney of Breed's Hill, dated March 7, 2008, to which 12 checks and a credit card statement were attached, summarized what Croteau learned.  In the letter, she stated the following:

> Enclosed are photocopies of the Bank Checks that were paid to the Fravel Insurance Company to pay the insurance for the years 2005, 2006, and 2007. The payments for the year 2007 were made in four payments, thru the Brotherhood Credit Union.  The 4th payment my mother made with "Two Checks."  One thru the Brotherhood Credit union [sic] and the other thru her Chase Credit Card, on one of the "Transfer Checks."  . . . I showed this statement to Gary's Father along with the other copies of checks for the payments that my mother had made for 2007.  Russ Fravel, Gary's Father reimbursed my mother for the balance of $11,334.00 that was due to the finance company "Prime Rate."  I have since paid off the note in full.
>
> The Check Payments For 2007 were as Follows:
>
> Sept. 18, 2007            $2,189.00               Brotherhood Credit Union

5

| | | |
|---|---|---|
| Oct. 08, 2007 | $2,905.00 | Brotherhood Credit Union |
| Nov. 13, 2007 | $4,124.00 | Brotherhood Credit Union |
| Dec. 27, 2007 | $3,108.00 | Brotherhood Credit Union |
| Dec. 27, 2007 | $2,500.00 | Brotherhood Credit Union |

> The check dated Dec. 27, 2007 in the amount of $3,108.00 was returned to us by Gary's Father as Gary had not cashed the check, and it was still in his possession. . . . I had checked with the finance company, and they had only received one payment in the amount of $3,000.00 on November 29, 2007 from the Fravel Insurance Company regarding our Insurance policies.

According to Croteau, the Butler family's policies obtained from Breed's Hill were never canceled.

Following Croteau's testimony, Paul Barringer ("Barringer"), a chartered property and casualty underwriter, and one of the founders of Breed's Hill, testified. He stated that he is a producer/agent broker, adding that he had "an excess and surplus lines license and a regular license." He testified that obtaining a license in Massachusetts required passing a test, although course work was not required. He also testified about how an insurance agent is expected to handle premiums, stating:

> My understanding is that payment by an insured to a broker is the same as payment by the insured to a company. They have met their responsibility. It is then the responsibility of the agent or the broker in the middle to ensure that the money finally gets to the insurance carrier who's the risk bearer.

He also testified about how premiums were handled at his prior employer, Kaler Carney & Liffler, where he served both as a vice-president and an executive vice-president, stating:

> For the most part we would receive the money from the insureds and then remit to the insurance carriers, the actual risk bearers. There were instances where the insurance companies would bill the insureds directly, which is called direct bill, but for the most part the money would come from the

6

insured through Kaler Carney and then onto the insurance company.

Barringer also explained that insurance premium payments are generally due within thirty days of issuance unless the insured uses a premium finance agency. He reiterated, stating:

> [P]ayment by the insured to an agent is basically the same as payment from the insured to the company. The insured has done his or her duty, and then it's up to the broker or the agent to make sure that that money, net of his or her commission, gets to the insurance company.

Barringer explained that Breed's Hill operates as a managing general agent, issuing policies with the approval of the insurance companies directly to insureds. He added that the policies are issued on behalf of the insured and transmitted through the broker who delivers the policies to the insureds.

Barringer further testified that since 1996 when he formed Breed's Hill there has been only one agent, Fravel, who has refused to remit premiums. He described the relationship between Breed's Hill and Fravel Insurance Agency as arm's length and limited, noting that Breed's Hill was involved with only three accounts on behalf of the Fravel Insurance Agency.

Barringer also testified that Breed's Hill had a program particularly tailored for "multi-unit habitational exposures like condominium associations, apartment buildings and things of that nature." In some cases, Breed's Hill would issue the policies; in other instances, the policies would be issued by the insurance companies. Although the Fravel Insurance Agency and Breed's Hill did not execute a written agreement, Barringer explained how the arrangement was designed to work:

7

I had nothing to do with Fravel on an individual person basis. The general procedure for the agency, which is really what I would be setting, is that we would bill the broker on a net basis the premium that would be due us payable to us within thirty days of the issuance of the invoice.

The agent, who would be one step closer to the actual insured, who then [would] be able to mark up the net quote that we would have supplied him to accommodate his own commission needs and bill that amount to the insured. The insured would remit back to the broker. The broker remits back to us. And we pay the carrier.

Barringer testified that Fravel owes Breed's Hill monies for premiums and that claims were paid to insureds who were clients of Fravel Insurance Agency by the insurance companies procured by Breed's Hill, although they would not have been paid if the policies had been canceled.  He further explained that the premium payments made to Fravel by insureds would include commissions so that what was to be remitted to Breed's Hill would be less than what Fravel received.  Breed's Hill would then transmit the premiums, as managing general agent, to the insurance company handling the risk.  If a finance company were involved, and was unpaid, it would have the ability to cause Breed's Hill to issue a notice of cancellation.  If premiums were not transmitted to Breed's Hill for payment to an insurance company after a binder was issued, Breed's Hill would pay the amount of the premium to the insurance companies to avoid immediate cancellation of the policy.

If Breed's Hill bound a policy on behalf of an insurance company and the invoice for the policy was not paid, the general procedure at Breed's Hill was to "start sending out statements, either on a weekly or a monthly basis, saying that this is now overdue, and if the thing continued to be delinquent it would be the  - - the initial [step] would be a notice

8

of intent to cancel followed by, if necessary, an actual cancellation notice." The statements would be transmitted to Fravel, while the cancellation notice would be directed to both Fravel and the insureds.

Emily LeBlanc ("LeBlanc"), the operations manager at Breed's Hill testified next. Her responsibilities included managing and being responsible for all back office systems, processes and computer systems. She stated that after Breed's Hill bound coverage with an insurance company, it issued a bill through its computer system which was sent either by facsimile, email or paper to the broker who obtained the business indicating that premiums were due within thirty days. The policies themselves were generated through Breed's Hill's computer system, printed from the computer system, administratively recorded and then printed or electronically e-mailed out to a broker such as Fravel.

LeBlanc also described Breed's Hill's system, known as Artemas, which permitted brokers to use its internal underwriting system. Pursuant to a user agreement, brokers were authorized to login to its system, and enter data to obtain a quote. Brokers would have to input the name of the insureds and identify the properties for which coverage was sought.

LeBlanc testified that she attended a luncheon meeting with Fravel following the issuance of a Memorandum to him by Barringer dated December 19, 2007. In the Memorandum, which contained the subject notation, "Notice of Impending Criminal Action," Breed's Hill demanded payment of $67,568. According to LeBlanc, Fravel was

"very offended" by the Memorandum and "very aggressive" in the way he communicated with LeBlanc and her co-worker, Ellen Mahony.  He refused to acknowledge that he received premiums from insureds and "simply told us that he had replacement coverage for those insureds" with the Andover Companies.  According to LeBlanc, he never provided any copies of polices showing that the insureds had insurance with the Andover Companies. Documents, namely so-called loss run statements, submitted into evidence established that insurance companies paid claims submitted by insureds who paid premiums to Fravel which were not remitted to Breed's Hill.

The final witness on behalf of Breed's Hill was Ellen Mahony ("Mahony"), a co-founder of Breed's Hill and its executive vice-president.  She testified that she is also the treasurer and clerk and responsible for the accounting department, bookkeeping and billing.  She added that she is also in charge of agency-broker relationships, company relationships and the day-to-day functions of the agency.

Mahony indicated that Breed's Hill, as the managing general agent, would pay premiums received from brokers to insurance companies less its commission. She testified that it was her understanding that once premiums are paid to the managing general agent they are "owned" by the insurance company, adding that when Breed's Hill signed a contract with an insurance company and regardless of whether premiums were collected or not, the premiums belonged to the insurance company and Breed's Hill would "have to front it to them no matter what."

Mahony testified that invoices were issued to brokers such as Fravel, not to the

insureds.  She explained:

> [W]e [Breed's Hill] want the broker to be charging a service fee for managing
> the insurance account, and he's coming to us for a service, so we certainly
> want the broker to be paid as well. So in the state of Massachusetts you
> cannot charge -- you can't pay a commission and then have the broker charge
> a service fee; it's either one or the other. So we chose to issue our program,
> have it be a net program so that the broker could charge a service fee and not
> be in violation of the state.

Mahony also described Breed's Hill's duties to the insurance companies, stating:

> The insurance company allows us to rate up the policies.  They give us
> basically what's called binding authority. They give us limits of liability that
> -- you know, that we have the authority to go ahead and write. So we would
> be quoting up the insurance and then we would -- you know, whatever we
> bind for the month, we just send them a monthly bordereau [sic].

According to Mahony, the insurance companies permitted Breed's Hill to set its premiums

subject to certain guidelines.

On or around June 4, 2007, Mahony contacted Fravel, attempting to collect $81,959

from him on behalf of Breed's Hill.  Breed's Hill continued to send Fravel invoices and

demands through 2007.  It received no response from Fravel, although on November 28,

2007, he forwarded to Breed's Hill a check in the sum of $3,075.  When Breed's Hill

commenced its state court action, it claimed $67,568 was due from Fravel, although at trial

Mahony stated that the current amount due is closer to $49,625 as a result of payments or

cancellations.

Finally Mahony testified that there were no conditions imposed on Fravel that he

put premiums received from insureds for policies obtained from Breed's Hill in a special account.   At the conclusion of Mahony's testimony, the Debtor moved for a directed verdict.

## IV. DISCUSSION

A. Standard Applicable to Judgment on Partial Findings

Rule 52(c) of the Federal Rules of Civil Procedure, made applicable to bankruptcy proceedings pursuant to Bankruptcy Rule 7052, provides:

> If a party has been fully heard on an issue during a nonjury trial and the court finds against the party on that issue, the court may enter judgment against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue. The court may, however, decline to render any judgment until the close of the evidence. A judgment on partial findings must be supported by findings of fact and conclusions of law as required by Rule 52(a).

Fed. R. Civ. P. 52(c), made applicable to this proceeding by Fed. R. Bankr. P. 7052.  The United States Bankruptcy Appellate Panel for the First Circuit recently set forth the standard applicable to Rule 52(c) motions in Bellas Pavers, LLC v. Stewart (In re Stewart), No. MB 12- 017, 2012 WL 5189048 (B.A.P. 1st Cir. Oct. 18, 2012).  It stated:

> A court should . . . enter a judgment under Rule 52(c) "[w]hen a party has finished presenting evidence and that evidence is deemed by the [judge] insufficient to sustain the party's position." Morales Feliciano v. Rullan, 378 F.3d 42, 59 (1st Cir .2004). "A motion for judgment on partial findings should be granted, 'where the plaintiff fails to make out a prima facie case, or despite a prima facie case, the court determines that the preponderance of evidence goes against the plaintiff's claim.'" Giza v. Amcap Mortg., Inc. (In re Giza), 458 B.R. 16, 24 (Bankr. D. Mass. 2011) (quoting Mosher v. Evergreen Mgmt., Inc. (In re Mosher), 432 B.R. 472, 475 (Bankr. D. N.H. 2010)); see also In re Marine Risks, Inc., 441 B.R. 181, 199 (Bankr. E.D.N.Y. 2010) (citations omitted)

12

(holding that court may allow Rule 52(c) motion if plaintiff has failed to make out prima facie case). The court is not required to "'draw any special inferences in the nonmovant's favor, or consider the evidence in the light most favorable to the nonmoving party. Instead, the court must [weigh] the evidence, resolv[e] any conflicts, and decid[e] where the preponderance lies.'" In re Giza, 458 B.R. at 24 (quoting Mosher, 432 B.R. at 475).

In re Stewart, 2012 WL 5189048 at *7.  In applying the standard articulated by the panel in Stewart, the Court is cognizant that exceptions to discharge are narrowly construed in furtherance of the Bankruptcy Code's fresh start policy, see Palmacci v. Umpierrez, 121 F.3d 781, 786 (1st Cir. 1997), and the party seeking a determination of nondischargeability must establish its claim by a preponderance of the evidence.  See Grogan v. Garner, 498 U.S. 279, 291 (1995).

      B. Section 523(a)(2)(A) Exception to Discharge

          1. Applicable Law

Section 523(a)(2)(A) of the Bankruptcy Code excepts from discharge a debt of an individual debtor "for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by . . . false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition." 11 U.S.C. § 523(a)(2)(A).  The Bankruptcy Appellate Panel in In re Stewart observed that "[t]o establish that a debt is nondischargeable under this section, a creditor must prove actual fraud, rather than mere fraud implied in law."  2012 WL 5189048 at *7 (citing Lawrence P. King, 3 Collier on Bankruptcy ¶ 523.08[1] (15th ed. rev. 2002)).

     In McCrory v. Spigel (In re Spigel), 260 F.3d 27 (1st Cir. 2001), the First Circuit set

forth the elements of actual fraud which must be established to sustain a claim under §

523(a)(2)(A) as follows:

> (1) the debtor made a knowingly false representation or one made in reckless disregard of the truth;

> (2) the debtor intended to deceive;

> (3) the debtor intended to induce the creditor to rely upon the false statement;

> (4) the creditor actually relied upon the misrepresentation;

> (5) the creditor's reliance was justifiable; and

> (6) the reliance upon the false statement caused damage.

Id. at 32 (citing Palmacci v. Umpierrez, 121 F.3d 781, 786 (1st Cir. 1997)).

2. Analysis

The record is devoid of evidence to support Breed's Hill's claim under §

523(a)(2)(A).  There was no testimony of any discussions whatsoever between Fravel and

anyone at Breed's Hill prior to the 2007 luncheon meeting at which Mahony and LeBlanc

attempted to obtain a repayment plan from Fravel with respect to the amount of premiums

Breed's Hill had invoiced him and which remained unpaid.

Breed's Hill did not submit evidence that Fravel promised, either orally or in

writing, to transmit premiums to Breed's Hill with knowledge of falsity and with an intent

to deceive.  The parties, as Barringer testified, had an arm's-length contractual relationship.

Both parties were intermediaries, acting for their own account as well as for the insureds

and the insurance companies.  When accepting an offer of coverage from an insurance

14

company (risk bearer) for which Breed's Hill served as managing general agent, the insureds transmitted their acceptance through Fravel. Fravel may have impliedly promised to transmit payments received from the insureds, and Breed's Hill may have justifiably relied on that promise for at most 90 days, but Breed's Hill did not establish actual fraud.

Relying upon Mass. Gen. Laws ch. 175, § 169, and Markel Serv. Ins. Agency, Inc. v. Tifco, Inc., 403 Mass. 401 (1988), Breed's Hill argues that the Debtor's receipt of premiums constituted a receipt of premiums by it, thereby binding Breed's Hill to honor claims against the insurance policies. In the first place, Breed's Hill did not honor claims, the insurance companies, such as Clarendon, honored the claims. Breed's Hill only advanced payments of the premiums to the insurance companies.

In Markel, the court described the arrangements among Markel, Ryan, an insurance agent who fraudulently obtained and withheld premiums from insureds, and Tifco, Inc., an insurance premium finance company like Prime Rate. The court stated:

> Pursuant to a brokerage agreement with Markel, Ryan obtained individual and commercial insurance for his customers by providing Markel with underwriting information and relaying back to the customer the quote for the proposed coverage. If the customer elected to accept the coverage, Ryan booked the business with Markel, who placed the policy with one of the underwriters for whom it was authorized to bind coverage.
>
> Under the brokerage agreement, Ryan was "primarily liable to Markel for the full amount of the premium" and Markel billed Ryan on a monthly basis for the premium due from the preceding month's business.
>
> Those insureds who wished to finance their premium obligations with Tifco

executed a PFA provided to Ryan by Tifco. The PFAs provided that Tifco
would pay the premium to the designated insurance company and the
insured agreed to repay Tifco the amount financed in amortized monthly
installments which included a finance charge. The PFAs also assigned to
Tifco as security all unearned and returned premiums and the PFAs gave
Tifco a power of attorney to cancel the coverage in the event of an insured's
default.

Tifco paid Ryan, not Markel, the full amount of the financed premium
knowing that Ryan did not immediately remit the premiums to Markel. After
paying Ryan, Tifco sent an advice of financed premium to the appropriate
underwriters, Markel, and Ryan. These advices notified them that the new
policy was being financed and that Tifco was the assignee of unearned and
returned premiums. Tifco's advices also requested an acknowledgment of
receipt. However, the judge found "Tifco procedures for monitoring receipt
of acknowledged advices . . . were imperfect: of the accounts in question,
Tifco could produce few Markel acknowledged Advices."

On numerous occasions between 1980 and 1982, Markel directed Tifco to pay
financed premiums directly to it rather than Ryan. Tifco refused to pay
Markel directly and notified Markel of its position that payment to Ryan
constituted payment to the insurer.

The financial losses at issue in this case resulted from Ryan's misconduct. .
. . Ryan was delinquent in paying his outstanding premium obligations, and
his monthly delinquency ran anywhere from $20,000 to $70,000.

403 Mass. at 403-04 (footnotes omitted).  The court observed that Ryan "executed a scheme

by which he would: (a) forge insured's names on the PFAs, or fraudulently induce insureds

to execute PFAs, or otherwise misappropriate funds; (b) collect the deposit premium from

the insured; (c) finance the premium balance with Tifco; (d) receive the financed amount

from Tifco; (e) fail to pay the premium payments to the insurer, or fail, on cancellation of

policies, to return funds to Tifco.   403 Mass. at 404 n.4.   Thus, Ryan also misrepresented

the status of insurance coverage and premium finance agreements.

Based upon its findings the Superior Court determined that Markel was an intended third party beneficiary of the PFAs. The Supreme Judicial Court disagreed, stating:

> An examination of the PFAs discloses that Markel is described as the insurer. It is apparent, therefore, that Markel as general agent with binding authority was acting in the stead of the underwriters. Ryan was acting for the insureds. Thus the discussions which finally settled the terms and conditions of the policy were conducted by Markel on behalf of the underwriters and Ryan on behalf of the insureds. In these circumstances the judge's conclusion that Ryan was not a negotiating broker was error as a matter of law. Since it is clear from the judge's findings both that Markel was acting in these transactions as the insurer and that Ryan was "the broker who obtained and finally settled the terms and conditions of the policy with the insurer," Morton Furniture Co. v. Dubuque Fire & Marine Ins. Co., *supra* at 175, 191 N.E. 637, it follows that Ryan was a negotiating broker within the meaning of G.L. c. 175, § 169, and therefore that payment to him was the equivalent of payment to the company.

Markel 403 Mass. at 406-07 (footnote omitted). The court's decision was predicated upon its interpretation of Mass. Gen. Laws ch. 175, § 169, which provides:

> An insurance agent or broker acting for a person other than himself in negotiating, continuing or renewing any policy of insurance or any annuity or pure endowment contract shall, for the purpose of receiving any premium therefor, be held to be the agent of the company, whatever conditions or stipulations may be inserted in the policy or contract.

Id. According to the court, "[t]his section protects insureds who reasonably believe that the broker who negotiates, continues, or renews insurance policies on their behalf is authorized to accept payment on behalf of the insurance company." Markel, 403 Mass. at 407 n.10 (citing Ritson v. Atlas Assurance Co., 279 Mass. 385, 392, 181 N.E. 393 (1932) ("[i]t seems plain that by its true interpretation it makes the payment of a premium to a broker payment to the company no matter what condition or stipulation may be contained in the

contract or policy to the contrary").

Because of the absence of a written contract or any other evidence pertinent to the six elements required to sustain a claim under § 523(a)(2)(A), the Court concludes that even if Fravel is determined to be the agent of Breed's Hill, there was no evidence, other than nonpayment of premiums, to support a claim for actual fraud. For example, other than the instances where Fravel endorsed the Butler's checks and deposited them in his personal account there was no evidence that Fravel made misrepresentations with intent to deceive Breed's Hill, rather than the customers whose funds he received and did not remit.  In the case of the Butlers, Breed's Hill failed to establish damages.  Russ Fravel returned monies to their daughter, Croteau, and she paid Prime Rate the money it was owed and no insurance policies were canceled.  Breed's Hill did not establish what, if any, premiums it paid on behalf of the Butlers because of Fravel's failure to remit payments.

The Plaintiff's default judgment obtained in the state court cannot cure the deficiencies in the trial testimony and the failure to adequately explain exhibits.  Breed's Hill did not plead fraud in its state court complaint and, accordingly, there was no identity of issues for purposes of collateral estoppel, even in addition to the absence of a judgment on the merits.

C. Section 523(a)(4) Exception to Discharge

1. Applicable Law

Section 523(a)(4) of the Bankruptcy Code provides that a discharge "does not

discharge an individual debtor from any debt . . . for fraud or defalcation while acting in a fiduciary capacity, embezzlement or larceny." 11 U.S.C. § 523(a)(4). The issue of whether a party is "acting in a fiduciary capacity" within the meaning of § 523(a)(4) is one of federal law, not state law.  Carlisle Cashway, Inc. v. Johnson (In re Johnson), 691 F.2d 249, 251 (6th Cir. 1982);  Petrucelli v. D'Abrosca (In re D'Abrosca), No. 10-062, 2011 WL 4592338 at *5 (B.A.P. 1st Cir. Aug. 10, 2011).  In order to be acting as a fiduciary, a party must be acting pursuant to an express or technical trust, not a trust which the law implies from a contract.  Davis v. Aetna Acceptance Co., 293 U.S. 328, 333, 55 S.Ct. 151, 153–54, 79 L.Ed. 393 (1934) (construing § 17(a)(4) of the Bankruptcy Act of 1898).  Substantive law may be considered to determine whether as a matter of federal law a debtor was acting in a fiduciary capacity.  Johnson, 691 F.2d at 251; D'Abrosca, 2011 WL 4592338 at *5 .

The United States Bankruptcy Appellate Panel for the First Circuit in Raso v. Fahey (In re Fahey), 482 B.R. 678 (B.A.P. 1st Cir. 2012), recently interpreted § 523(a)(4), observing that "[t]his bar to discharge reaches debts incurred through abuses of fiduciary positions . . . [and] involv[es] debts arising from the debtor's acquisition or use of property that is not the debtor's." Id. at *6 (citing FNFS, Ltd. v. Harwood (In re Harwood), 637 F.3d 615, 619 (5th Cir.2011) (citations and internal quotations omitted). The Bankruptcy Appellate Panel added:

> [A] creditor must establish three elements to invoke the § 523(a)(4) exception
> to dischargeability. "First, the debt must result from a fiduciary's defalcation
> under an "express or technical trust" . . . Second, the debtor must have acted
> in a fiduciary capacity with respect to the trust. . . . Third, the transaction in

19

question must be a "defalcation" within the meaning of bankruptcy law." <u>Chao v. Duncan (In re Duncan)</u>, 331 B.R. 70, 77 (Bankr. E.D.N.Y. 2005) (citations omitted).

<u>Fahey</u>, 482 B.R. at 687.

The requirement of an express trust requires "an explicit declaration of trust, a clearly defined trust res, and an intent to create a trust relationship." <u>Id.</u> (citing <u>Gehlhausen v. Olinger (In re Olinger)</u>, 160 B.R. 1004, 1014 (Bankr. S.D. Ind. 1993) (internal quotations and citations omitted); <u>LaPointe v. Brown (In re Brown)</u>, 131 B.R. 900, 905 (Bankr. D. Me. 1991)). In contrast, a technical trust "'arises under statute or common law.'" <u>Fahey</u>, 482 B.R. at 688 (quoting <u>In re D'Abrosca</u>, 2011 WL 4592338, at *5; <u>Farley v. Romano (In re Romano)</u>, 353 B.R. 738 (Bankr. D. Mass. 2006); <u>M–R Sullivan Mfg. Co. v. Sullivan ( In re Sullivan)</u>, 217 B.R. 670, 674 (Bankr. D. Mass. 1998); <u>Collenge v. Runge (In re Runge)</u>, 226 B.R. 298, 305 (Bankr. D. N.H. 1998)). Additionally, according to the Bankruptcy Appellate Panel in <u>Fahey</u>, "[w]here the basis for the existence of a technical trust is statutory, the statute must "(1) define[ ] the trust res, (2) spell[ ] out the trustee's fiduciary duties, and (3) impose[ ] a trust prior to and without reference to the wrong that created the debt." 482 B.R. at 488 (citing <u>Stowe v. Bologna (In re Bologna)</u>, 206 B.R. 628, 632 (Bankr. D. Mass.1997)).

In addition to the existence of an express trust and fiduciary capacity with respect to the trust, a plaintiff must establish a defalcation. The First Circuit  has held that "defalcation requires some degree of fault, closer to fraud, without the necessity of meeting a strict specific intent requirement." <u>Baylis v. Rutanen (In re Baylis)</u>, 313 F.3d 9, 18 (1st Cir.

2002).

    2. Analysis

  In support of its position that its judgment is nondischargeble pursuant to §

523(a)(4), Breed's Hill relies upon Mass. Gen. Laws ch. 175, § 176 which provides:

> An insurance agent or broker who acts in negotiating or renewing or
> continuing a policy of insurance or an annuity or pure endowment contract
> issued by a company lawfully doing business in the commonwealth, and
> who receives any money or substitute for money as a premium for such a
> policy or contract from the insured or holder thereof, *shall be deemed to hold*
> *such premium in trust for the company*. If he fails to pay the same over to the
> company after written demand made upon him therefor, less his commission
> and any deductions to which, by the written consent of the company, he may
> be entitled, such failure shall be prima facie evidence that he has used or
> applied the said premium for a purpose other than paying the same over to
> the company, and upon conviction thereof he shall be guilty of larceny.

Mass. Gen. Laws ch. 176, § 175 (emphasis supplied).  This Court must determine whether

this statute satisfies the requirements for a technical trust and whether a fiduciary

relationship existed between Breed's Hill and Fravel particularly where, as the court noted

in In re Fahey, "[t]he term 'fiduciary' does not apply to "trusts that are imposed by law as

a remedy." See In re Sullivan, 217 B.R. at 675 (citing Davis v. Aetna Acceptance Co., 293 U.S.

328, 333 (1934).  As a result, "implied or constructive trusts, and trusts ex maleficio do not

establish fiduciary relationships under the Code." Id. (citing Davis v. Aetna Acceptance

Co., 293 U.S. at 333).

  The court in Comm'r of Ins. of P.R. v. del Valle Otero (In re del Valle Otero), 174 B.R.

873 (Bankr. D.P.R. 1994), observed that "[i]n the insurance context, a fiduciary relationship

has been widely found where state laws create trust-like obligations. 174 B.R. at 880 (citing

Quaif v. Johnson, 4 F.3d 950, 953–954 (11th Cir. 1993) (fiduciary relationship found to exist

where Georgia law prohibited insurance proceeds collected by agent to be commingled

with personal funds and required their promptly report and transfer to the insurer)).  In

del Valle Otero, the court considered a Puerto Rican law which required the segregation

of  funds representing premiums or returned premiums received by an insurance agent,

general agent or broker who were to act in a fiduciary capacity, as well as the requirement

that agents account for and pay over the funds to the person entitled to them within 15

days of demand.  174 B.R. at 880 (citing 26 L.P.R.A. § 938 (1974)).  The court determined

that "[a]ccording to the statute, insurance premiums collected by the general agent form

a trust and specific fiduciary duties are required in relation thereto." Id.  In addition, the

court relied upon a written contract which existed between the parties which also

prohibited the commingling of premiums with personal or general funds of the agent. Id.

Similarly, in Coronet Ins. Co. v. Blumberg (In re Blumberg), 112 B.R. 236 (Bankr.

N.D. Ill. 1990), the court determined that an express or technical trust was created under

an Illinois statute which required agents to hold premiums "in a fiduciary capacity."  The

court also considered associated regulations which required licensed agents to establish a

"Premium Fund Trust Account," defined as "'a special fiduciary account established and

maintained by a licensee into which all premiums collected are to be deposited.'" Id. at 241-

42. See also Nassau Suffolk Limousine Assoc., Inc. v. Jardula (In re Jardula), 122 B.R. 649

(Bankr. E.D.N.Y. 1990)(debt nondischargeable where debtor pled guilty to larceny and New York statute required agents to hold funds in a fiduciary capacity and to refrain from mingling them with any other funds).

Those courts which have determined that the plaintiff sustained its burden of proof under § 523(a)(4) have either relied upon state statutes which require agents to hold funds in a fiduciary capacity and segregate such funds, or written agreements which contain all the elements for finding the existence of an express trust.  Breed's Hill admitted that there was no written agreement governing the relationship between it and Fravel, although there can be no dispute that under state law, *see* Mass. Gen. Laws ch. 175, § 169, "an agent-principal relationship existed. Standing alone, however, an agent-principal relationship is insufficient to establish the type of fiduciary duty contemplated by § 523. Commonwealth Land Title Co. v. Blaszak (In re Blaszak), 397 F.3d 386, 391 (6th Cir. 2005)(citing Capitol Indemnity Corp. v. Interstate Agency, Inc. (In re Interstate Agency, Inc.), 760 F.2d 121, 125 (6th Cir.1985)).

Breed's Hill argues that Mass. Gen. Laws ch. 175, § 176 creates a technical trust, relying upon Markel, and that the decision in Am. Home Assurance Co. v. Katzen (In re Katzen), 47 B.R. 738 (Bankr. D. Mass. 1985), has been superceded by Markel and is in any event  distinguishable from the instant case because the debtor in Katzen was never a broker or agent for the insurance company and the insurance company failed to show that the debtor collected premiums on its behalf.  It states "Mass. Gen. Laws ch. 176, § 169 [sic]

23

specifically creates a fiduciary relationship whereby insurance brokers collect premiums from insureds in their capacity as agents for the insurance companies." Breed's Hill further argues that that the Supreme Judicial Court found that a fiduciary relationship existed between an agent and an insurance company based upon Mass. Gen. Law ch. 175, § 169. The Court disagrees and finds that <u>Markel</u> in no way supports Breed's Hill's argument; indeed Breed's Hill misrepresents the holding of the Supreme Judicial Court in <u>Markel</u>.

This Court finds that the statute upon which Breed's Hill relies creates a trust ex malificio. According to the Supreme Court "[i]t is not enough that, by the very act of wrongdoing out of which the contested debt arose, the bankrupt has become chargeable as a trustee ex maleficio." <u>Davis v. Aetna Acceptance Co.</u>, 293 U.S. at 333. Although the Massachusetts statute refers to holding premiums in trust, it does not require the segregation of the premiums or otherwise spell out fiduciary duties. Accordingly, the Court finds that the statute does not satisfy the requirements imposed by the bankruptcy appellate panel in <u>Fahey</u>, 2012 WL 5861746 at *7.[2] This Court agrees with the holding and rationale of <u>Am. Home Assurance Co. v. Katzen (In re Katzen)</u>, 47 B.R. 738 (Bankr. D. Mass. 1985), in which the court stated the following:

> Massachusetts statute, M.G.L. c. 175, refers to the insurance company/insurance broker relationships as a trust, the statute does not give rise to fiduciary relationship between the company and agent. *See* <u>In Re Koritz</u>, 2 B.R. 408, 415–16 (Bankr. D. Mass. 1979). Rather, in determining

---

[2] The First Circuit in a footnote in <u>Baylis</u>, 313 F.3d at 17 n.3, noted that the holding in <u>Davis</u> may be in doubt as a result of the ruling in <u>Republic of Rwanda v. Uwimana (In re Uwimana)</u>, 274 F.3d 806, 811 (4th Cir. 2001).

whether an insurance agent is a fiduciary to an insurance company for premiums held, the dealings between the parties must be examined to determine whether there was a duty to segregate and account for funds. *See* Matter of Storms, 28 B.R. 761, 764 (Bankr.E.D.N.C.1983). An insurance agent is not a fiduciary to the company with respect to premiums held where premiums are paid to the agent subject only to the later obligation to repay the insurance company its share. *See* In Re Morris, 37 B.R. 682, 683 (Bankr. D. Ore.1983). . . . The typical relationship between insurance agent and insurance company in connection with premiums held is that of debtor and creditor, in the absence of evidence to support a contrary intent. *See* In Re Koritz, 2 B.R. 408, 415–16 (Bankr. D. Mass.1979).

Katzen, 47 B.R. at 741-42. The court added:

In the present case, I find no fiduciary relationship between the individual debtor and the plaintiffs. No agreement creating such a relationship was offered. The course of dealings indicates a typical insurance agent/carrier/customer relationship where the agent would receive premiums, deposit them, and merely had the duty to pay the company its share. ABS & Katzen had no contractual or implied duty to segregate or account for premiums, and there was no prohibition against using them. This was nothing more than a debtor/creditor relationship.

Id. at 742.

Parenthetically, Breed's Hill did not reference either embezzlement or larceny in its

brief. The United States Court of Appeals for the First Circuit in Sherman v. Potapov (In

re Sherman), 603 F.3d 1 (1st Cir. 2010), stated:

There being no definition of embezzlement in § 523 or elsewhere in the Bankruptcy Code, we assume that Congress wrote with the common law in mind, Neder v. United States, 527 U.S. 1, 23, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999), and United States v. Young, 955 F.2d 99 (1st Cir. 1992), will suffice for an explanation of the traditional elements of embezzlement [sic]. Embezzlement is "the fraudulent conversion of the property of another by one who is already in lawful possession of it." Id. at 102 (internal quotation marks omitted). Thus, to amount to embezzlement, conversion must be committed by a perpetrator with fraudulent intent. . . .

25

In re Sherman, 603 F.3d at 13. In Treadwell v. Glenstone Lodge, Inc. (In re Treadwell), 459

B.R. 394 (Bankr. W.D. Mo. 2011), the court set forth the requirements necessary to establish

embezzlement or larceny under § 523(a)(4). It stated:

> Embezzlement is the fraudulent appropriation of property by a person to
> whom such property has been entrusted, or into whose hands it has lawfully
> come. It differs from larceny in the fact that the original taking of the
> property was lawful, or with the consent of the owner, while in larceny the
> felonious intent must have existed at the time of the taking.

> The required elements of embezzlement are: (1) appropriation of funds for
> the debtor's own benefit by fraudulent intent or deceit; (2) the deposit of the
> resulting funds in an account accessible only to the debtor; and (3) the
> disbursal or use of those funds without explanation of reason or purpose. For
> purposes of section 523(a)(4) it is improper to automatically assume
> embezzlement has occurred merely because property is missing, since it
> could be missing simply because of noncompliance with contractual terms.

In re Treadwell, 459 B.R. at 406. See also Farley v. Romano (In re Romano), 353 B.R. 738,

765-66 (Bankr. D. Mass. 2006) (citing KMK Factoring, L.L.C. v. McKnew (In re McKnew),

270 B.R. 593, 631-32 (Bankr. E.D. Va. 2001)).

Fravel admits that the Plaintiff introduced evidence that the Butlers had between

December 29, 2005, and November 13, 2007 paid a series of checks totaling $34,170.00 to

Fravel, as well as testimony about amounts of money that it believes it is owed by Fravel.

He argues, however, that Breed's Hill submitted no evidence that he was in possession of

any property belonging to the Plaintiff, or that he appropriated any property of Breed's Hill

for a use other than that which it was intended, or of any other circumstances indicating

fraud. The Debtor adds that Breed's Hill, presumably, by introducing evidence concerning

26

payments made by the Butlers to Fravel, was attempting to establish that Fravel embezzled

those funds.  Fravel maintains that, although the funds were presumably paid to Fravel by

the Butlers with the intention that they would be used to pay premiums on insurance

policies for them, there was no evidence to explain what happened to the funds paid to

Fravel by the Butlers.  Croteau testified that none of the policies obtained by Fravel were

ever cancelled (for nonpayment or otherwise) and that, while the Butlers did receive a

notice of intent to cancel a policy, Fravel's father turned over funds to her which were used

to pay a premium financing company (Prime Rate) which had financed the policies. The

Debtor concludes, correctly, that

> Even if the Plaintiff had established that Fravel received funds from the
> Butlers which were intended by the Butlers to procure insurance policies for
> the Butlers and then used the funds for some other purpose and failed to
> obtain the policies, (and the Plaintiff did not establish that), the Butlers, not
> Breed's Hill, would have been the victims of any such embezzlement.

D. <u>Section 523(a)(6) Exception to Discharge</u>

1. Applicable Law

In <u>Zhao v. Lauzon (In re Lauzon)</u>, No. 10-10641-JNF, 2012 WL 1192800 (Bankr. D.

Mass. April 9, 2012), this Court summarized the law applicable to § 523(a)(6), which

excepts from discharge debts "for willful and malicious injury by the debtor to another

entity or to the property of another entity." 11 U.S.C. § 523(a)(6).   The Court stated:

> In <u>Kawaauhau v. Geiger</u>, 523 U.S. 57, 118 S.Ct. 974, 140 L.Ed.2d 90 (1998), the
> Supreme Court analyzed the "willful" component of section 523(a)(6). It
> stated:

The word "willful" in (a)(6) modifies the word "injury," indicating that nondischargeability takes a deliberate or intentional injury, not merely a deliberate or intentional act that leads to injury. Had Congress meant to exempt debts resulting from unintentionally inflicted injuries, it might have described instead "willful acts that cause injury." Or, Congress might have selected an additional word or words, i.e., "reckless" or "negligent," to modify "injury." Moreover, as the Eighth Circuit observed, the (a)(6) formulation triggers in the lawyer's mind the category "intentional torts," as distinguished from negligent or reckless torts. Intentional torts generally require that the actor intend "the consequences of an act," not simply "the act itself." Restatement (Second) of Torts § 8A, Comment a, p. 15 (1964) (emphasis added).

523 U.S. at 61–62, 118 S.Ct. 974, 140 L.Ed.2d 90. As a result of the Supreme Court's decision, actions of the debtor which simply cause injury, but which are not deliberately undertaken, are not excepted from discharge. Because the Supreme Court found that the defendant's medical malpractice did not rise to the level of willful injury, the Court did not reach the question of what the term "malicious" added to the analysis. Id.

The United States Court of Appeals for the First Circuit in Printy v. Dean Witter Reynolds, Inc., 110 F.3d 853 (1st Cir.1997), held that the element of malice in section 523(a)(6) requires that the creditor show that the willful injury was caused without justification or excuse, adding that "personal hatred, spite or ill-will" need not be established to find the element of malice. Id. at 859. The Printy formulation is followed by bankruptcy courts in this circuit. See, e.g., In re Peckham, 442 B.R. at 78 (citing Hermosilla v. Hermosilla (In re Hermosilla), 430 B.R. 13, 22 (Bankr.D.Mass.2010); Bauer v. Colokathis, 417 B.R. 150, 158 (Bankr. D. Mass. 2009); Caci v. Brink (In re Brink), 333 B.R. 560, 567 (Bankr.D.Mass.2005); Gomes v. Limieux (In re Limieux), 306 B.R. 433, 440 (Bankr. D. Mass. 2004); and McAlister v. Slosberg (In re Slosberg), 225 B.R. 9, 21 (Bankr. D. Maine 1998).

In re Lauzon, 2012 WL 1192800 at *9.

2. Analysis

The Court finds that Breed's Hill failed to introduce sufficient evidence for this

Court to find that Fravel willfully intended the injuries to the Plaintiff or that he acted with malice.  Because the Plaintiff rested without calling Fravel as a witness, this Court has no evidence of the financial health of the Debtor's insurance business or his personal financial circumstances.  In addition, the Court has no evidence that the Debtor engaged in similar conduct with other managing general agents.  Therefore, the Court lacks evidence from which it could infer willful and malicious intent as opposed to mere negligence or breach of contract.  Moreover, the Court cannot discern from the record the extent of the Debtor's knowledge of Breed's Hill's contractual obligations to Clarendon or other insurance agencies for which Breed's Hill acted as managing general agent.

Statutorily, Fravel was an agent of Breed's Hill.  Breed's Hill extrapolates from the statute, Mass. Gen. Laws ch. 175, § 169,  that Fravel's receipt of funds from insureds was the equivalent of its receipt of those funds because Fravel was its agent.  Thus, by failing to remit premiums, he converted them to his own use.  As the court noted in Doherty v. Coccia (In re Coccia), 351 B.R. 17 (Bankr. D. R.I. 2010),

> Section 523(a)(6) requires more than merely conversion. The Supreme Court has stated: "There is no doubt that an act of conversion, if willful and malicious, is an injury to property within the scope of this exception. . . . But a willful and malicious injury does not follow as of course from every act of conversion, without reference to the circumstances." Davis v. Aetna Acceptance Co., 293 U.S. 328, 332, 55 S.Ct. 151, 79 L.Ed. 393 (1934). Negligent or reckless acts will not suffice. See Geiger, 523 U.S. at 63–64, 118 S.Ct. 974.

Coccia, 351 B.R. at 21.

## V. CONCLUSION

Upon consideration of the foregoing, the Court finds that Fravel is entitled to judgment on partial findings.  The Court shall enter an order granting the Defendant's Motion for a Judgment on Partial Findings.  In addition, the Court shall enter judgment in favor of the Defendant and against the Plaintiff.

By the Court,

Joan N. Feeney
United States Bankruptcy Judge

Dated:  January 2, 2013